# United States Court of Appeals for the Federal Circuit

2007-1138

METCHEM, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

James Caffentzis, Fitch, King and Caffentzis, of New York, New York, argued for plaintiff-appellee.

Saul Davis, Senior Trial Counsel, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellant. With him on the brief were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, and Barbara S. Williams, Attorney in Charge. Of counsel on the brief was Michael W. Heydrich, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

Appealed from: United States Court of International Trade

Chief Judge Jane A. Restani

# United States Court of Appeals for the Federal Circuit

2007-1138

METCHEM, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of International Trade in case no. 04-00238, Chief Judge Jane A. Restani.

———————————

DECIDED:  January 22, 2008

———————————

Before LOURIE, DYK, and PROST, Circuit Judges.

LOURIE, Circuit Judge.

The United States appeals from the decision of the United States Court of International Trade classifying certain imports under subheading 7501.20.00 of the Harmonized Tariff Schedule of the United States ("HTSUS").  MetChem, Inc. v. United States, 441 F. Supp. 2d 1269 (Ct. Int'l Trade 2006).  Because the trial court correctly classified the imports, we affirm.

BACKGROUND

The subject merchandise is known commercially as basic nickel carbonate. It is obtained from the Yabulu Nickel Refinery in Queensland, Australia. MetChem, Inc. ("MetChem") imports it into the United States and is the only known customer of the basic nickel carbonate produced at Yabulu.

The material is a product of what is known as the Caron process, a hydro-metallurgical process of refining laterite ore into nickel metal sinters. The first steps of the Caron process involve the drying and roasting of the laterite ore, followed by a leaching of the ore with an ammonia solution that dissolves around fifty percent of the cobalt in the ore. At that point, the ore has been liquefied into a solution of dissolved nickel and cobalt and is treated with hydrogen sulfide to further separate the cobalt from the nickel. The remaining nickel-containing solution is distilled to drive off ammonia and carbon dioxide. The nickel content of the material is between fifty-two and fifty-five percent.

Separated from the subject material, the majority of the chemically processed ore at the Yabulu factory continues along the Caron process. The material that remains in the Caron process is calcined, reduced, compacted, and sintered, which leads to nickel oxide sinters. Those additional processes increase the percentage of nickel in the product from around fifty-five percent at the stage in which the basic nickel carbonate is removed from the Caron process, to over ninety percent when in sinter form. The nickel oxide sinters are sold for use in the production of stainless steel and other alloys.

In March 2003, MetChem entered the subject merchandise into the United States under HTSUS subheading 7501.20.00, which covers "Nickel mattes, nickel oxide

sinters, and other intermediate products of metallurgy: . . . Nickel oxide sinters and other intermediate products of metallurgy," and which entitles entries to duty-free treatment. However, the United States Bureau of Customs and Border Protection ("Customs") changed the classification and liquidated the material under HTSUS subheading 2836.99.50, which covers "Carbonates; peroxocarbonates (percarbonates); commercial ammonium carbonates containing ammonium carbamate: . . . Other . . . Other . . . Other," and imposes a 3.7 percent ad valorem duty.

MetChem protested Customs' liquidation, but on October 2, 2002, Customs rejected that protest. MetChem sought reconsideration from Customs, and on November 3, 2003, Customs again held that the basic nickel carbonate had been properly liquidated under HTSUS subheading 2836.99.50.

MetChem brought suit in the Court of International Trade contesting Customs' protest denial. After trial, the court reversed Customs' ruling and held that the subject merchandise was properly classifiable under Heading 7501, not under Heading 2836. MetChem, 441 F. Supp. 2d at 1272. The court found that MetChem's basic nickel carbonate was classifiable under 7501 because it was an "intermediate product of metallurgy." Id. The court held that HTSUS Heading 2836 was inapplicable because it applied only to "[s]eparate chemical elements and separate chemically defined compounds," neither of which correctly described the subject merchandise. Id. at 1273 (quoting HTSUS Chapter 28, Note 1(a)). Relying on the HTSUS Explanatory Notes, lexicographic authorities, and legal precedent, the court found that for a substance to be considered a "separate chemically defined compound" for the purpose of Chapter 28,

Note 1(a), the substance must be chemically composed of two or more elements in definite proportions, and the material here was not.

The government timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review questions of law <u>de novo</u>, including the interpretation of the terms of the HTSUS, while factual findings by the Court of International Trade are reviewed for clear error. <u>Home Depot U.S.A., Inc. v. United States</u>, 491 F.3d 1334, 1335 (Fed. Cir. 2007); <u>Better Home Plastics Corp. v. United States</u>, 119 F.3d 969, 971 (Fed. Cir. 1997). Despite our <u>de novo</u> review of interpretations of tariff provisions, classification decisions by Customs interpreting provisions of the HTSUS may receive some deference under the principles of <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944). <u>See</u> <u>Rocknel Fastener, Inc. v. United States</u>, 267 F.3d 1354, 1357 (Fed. Cir. 2001) (citing <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001)). However, Customs' rulings are "not controlling upon the courts by reason of their authority," <u>Skidmore</u>, 323 U.S. at 140, and "this court has an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." <u>Warner-Lambert Co. v. United States</u>, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

On appeal, the government argues that the Court of International Trade erred in its interpretation of the scope and requirements of HTSUS Chapter 28, Note 1(a). The government claims that the court's interpretation of "separate chemically defined compound" narrows the scope of Chapter 28 to such a degree that materials that are specifically allowed under that Chapter would fail to meet the court's definition.

Furthermore, the government contends that the language and legislative history of Heading 7501 and the notes of Chapter 28 demonstrate legislative intent to classify chemicals such as basic nickel carbonate under Chapter 28. The government further argues that the court clearly erred in determining that the chemical composition of the subject material was not stoichiometric. Alternatively, the government argues that even if the subject merchandise can be classified under both Heading 7501 and Heading 2836, the General Rules of Interpretation ("GRI") of HTSUS require classification under the heading with the most specificity which, the government argues, is Heading 2836.

MetChem responds that both the court's interpretation of "separate chemically defined compound" and its finding that the subject merchandise is not such a compound are correct. MetChem argues that the imported material is an intermediate product of a metallurgical process and is therefore properly classified under Heading 7501. Alternatively, MetChem argues that were the court to find that the subject merchandise is prima facie classifiable under both Headings 2836 and 7501, the merchandise must be liquidated under Heading 7501 because it is both the more specific of the two headings as well as the later in numerical order.

We agree with MetChem that the Court of International Trade correctly held that the subject merchandise is properly classified under subheading 7501.20.00.

When interpreting a tariff classification, we look first to the GRI that govern the classification of goods under HTSUS. Home Depot, 491 F.3d at 1336. GRI 1 states that "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes." After consulting the headings and relevant section or chapter notes, we may consult the Explanatory Notes of the relevant

chapters, although they are not binding upon us. See Michael Simon Design v. United States, 501 F.3d 1303, 1307 (Fed. Cir. 2007) (citing Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994)). Thus, we must determine whether the subject merchandise is classifiable under HTSUS subheading 2836.99.50 or HTSUS subheading 7501.20.00 by relying on the headings, section notes, and chapter notes, and referencing the Explanatory Notes when appropriate.

A.   HTSUS subheading 2836.99.50

Customs liquidated the subject merchandise under subheading 2836.99.50: "Carbonates; peroxocarbonates (percarbonates); commercial ammonium carbonate containing ammonium carbamate: . . . Other: . . . Other: . . . Other." While the language of that subheading seemingly encompasses all carbonates, Chapter 28, Note 1(a) limits the carbonates that are classifiable under that chapter:

> 1.   Except where the context otherwise requires, the headings of this chapter apply only to:
> (a)   Separate chemical elements and separate chemically defined compounds, whether or not containing impurities;
> (b)   The products mentioned in (a) dissolved in water.

It is undisputed that the subject merchandise is not a separate chemical element. We must therefore decide if the merchandise is a separate chemically defined compound. If it is not a separate chemically defined compound, and the context does not "otherwise require[ ]," then Chapter 28, Note 1(a) excludes the merchandise from categorization under Heading 2836.

For guidance on the definition of "separate chemically defined compound," we refer to the Chapter 28 Explanatory Notes:

> A separate chemically defined compound is a substance which consists of one molecular species (e.g. covalent or ionic) whose

composition is defined by a constant ratio of elements and can be represented by a definitive structural diagram. In a crystal lattice, the molecular species corresponds to the repeating unit cell.

The elements of a separate chemically defined compound combine in a specific characteristic proportion determined by the valency and the bonding requirements of the individual atoms. The proportion of each element is constant and specific to each compound and is therefore said to be stoichiometric.

The subject merchandise here does not consist of one molecular species whose composition is defined by a constant ratio of elements. On appeal, MetChem describes the imported material as "the product, invoiced as a basic nickel carbonate, which is in fact, as found by the trial court, an undifferentiated mixture of a number of basic nickel carbonates." Appellee Br., at 16. While it is not entirely clear whether MetChem is characterizing the imported material as a mixture of different basic nickel carbonates or as an undifferentiated mixture of the individual molecules ($NiCO_3$, $Ni(OH)_2$, $H_2O$) that form basic nickel carbonate, the result is the same either way. A material consisting of several chemical compounds in a variable ratio—particularly one that is variable because of the specific details of the process by which the material is made—is not a separate chemically defined compound because it cannot be represented by a precise formula. Therefore, the subject merchandise is not a separate chemically defined compound. See also Hawley's Condensed Chemical Dictionary 289 (14th ed. 2001) (defining "compound" as "a homogenous entity where the elements have definite proportions by weight and are represented by a chemical formula").

The government points to compounds that are specifically enumerated under Heading 2836 as evidence that combinations of compounds are allowable under Heading 2836, such as bismuth carbonate and lead carbonate. The government's argument, however, is unpersuasive. Chapter 28, Note 1(a) does not exclude

combinations of compounds from classification; rather, it forbids from classification unspecified mixtures, such as the merchandise at issue. The entities cited by the government have definite proportions by weight and are represented by a distinct and definite chemical formula, unlike the subject merchandise. Furthermore, the entities cited by the government are specifically listed in the explanatory notes as classifiable entities. Therefore, even if they were not separate chemically defined compounds, they would still be classifiable under Chapter 28 because they are specifically listed. Clearly, that is a situation in which the context requires inclusion, even though the entity would be excluded under Chapter 28, Note 1(a).[1]

Moreover, the government points to the fact that the Explanatory Notes to Heading 2836 explicitly include "Nickel carbonates." The government claims that that inclusion, and the explicit exclusion of natural basic nickel carbonate (zaratite), indicate that basic nickel carbonate (other than zaratite) is indeed classifiable under Heading 2836. The government's argument, however, is premised upon a misunderstanding of the Court of International Trade's holding. Chapter 28 does not disallow all basic nickel carbonates from classification under Heading 2836; rather, it merely requires that an import of basic nickel carbonate be a separate chemically defined compound in order to be so classified. The merchandise at issue is a mixture, not a separately defined compound, and thus is not properly classified under Heading 2836.

---

[1] The government similarly argues that if the subject merchandise is not a separate chemically defined compound, Chapter 28 allows its inclusion because the context requires otherwise. We reject this argument because, unlike those entities that are specifically enumerated in the explanatory notes, there is nothing in the HTSUS that indicates that a mixture, such as that involved here, was intended to be classified under Chapter 28. This is not a "context" case.

B.    HTSUS subheading 7501.20.00

We now turn to the question of whether the subject merchandise is properly classified under subheading 7501.20.00: "Nickel mattes, nickel oxide sinters and other intermediate products of nickel metallurgy: . . . Nickel oxide sinters and other intermediate products of nickel metallurgy." We conclude that it is classifiable under that heading. The subject merchandise is not a nickel oxide sinter and therefore must be an intermediate product of metallurgy to be classified under Heading 7501. The government does not dispute that the merchandise is a product of a metallurgical process. However, the government argues that the merchandise is removed too early in the Caron process to be considered "intermediate." The government also relies on the canon of ejusdem generis to argue that only a product with a nickel content similar to that of nickel mattes or nickel oxide sinters should be classified as an "intermediate product."

It is clear in this case that the subject merchandise is an intermediate product. The subject merchandise is removed from a metallurgical process that produces nickel oxide sinters, which are specifically enumerated intermediate products of metallurgy. The fact that it is removed does not change the fact that it was, before removal, an intermediate product of nickel metallurgy. The subject merchandise is removed at a point in the process when the chemical leaching and distilling, which is performed in order to separate the nickel from other materials, has already occurred. These steps have increased the nickel content from less than one percent in the laterite ore to over fifty percent in the subject merchandise. The steps of the process left to be performed involve purely nickel metallurgical processes, namely, calcining, compacting, and

sintering, which further purify the nickel content of the material to around ninety percent. Clearly, the subject merchandise is an intermediate product in this process. Furthermore, there is no HTSUS language requiring an "intermediate product of metallurgy" to have a particular nickel content and we decline to read such a requirement into the HTSUS. The subject merchandise is therefore properly classified under subheading 7501.20.00.[2]

## CONCLUSION

Accordingly, the judgment of the United States Court of International Trade is affirmed.

## AFFIRMED

---

[2] Because the subject merchandise is classifiable under subheading 7501.20.00 and not under 2836.99.50, we need not address the parties' arguments regarding which heading governs in a case in which a material is prima facie classifiable under both headings.